**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
| | )
| **TODD R. CAVANAUGH,** | )
| | )
| **Plaintiff** | )
| | )
| **v.** | )     **Civil Action No. 12-11378-DJC**
| | )
| **UNITED STATES OF AMERICA,** | )
| | )
| **Defendant.** | )
_____)

**MEMORANDUM OF DECISION**

**CASPER, J.**                                               **December 31, 2014**

## I.    INTRODUCTION

Plaintiff Todd R. Cavanaugh ("Cavanaugh") brings this action against the Defendant, the United States of America,[1] under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, for claims arising out of Cavanaugh's alleged sexual relationship with Renee T. Donahue ("Donahue"), a Veterans Administration ("VA") rehabilitation technician. Cavanaugh claims that Donahue used her position as a counselor in the VA's drug treatment program to initiate a sexual relationship with him, which undermined Cavanaugh's recovery and led to his relapse into drug abuse. The matter proceeded to a bench trial on Cavanaugh's claims for professional malpractice (Count I) and intentional infliction of emotional distress (Count III). Having

---

[1] Cavanaugh filed this action against Renee T. Donahue, the United States Department of Veterans Affairs and Edith Nourse Rogers VA Medical Center. The United States was substituted for these defendants pursuant to 28 U.S.C. § 2679. D. 18.

1

received proposed findings of fact and conclusions of law from the parties, D. 65, 66, the Court now issues its findings of facts and conclusions of law and enters judgment for the Defendant.

## II.    PROCEDURAL HISTORY

Cavanaugh filed his complaint on July 30, 2012. D. 1. Before trial, Cavanaugh filed a motion for spoliation of evidence and for sanctions on March 12, 2014. D. 35. The Defendant filed a motion for judgment as a matter of law on May 30, 2014. D. 46. On June 11, 2014, Cavanaugh filed an assented-to motion of voluntary dismissal of his claims for breach of fiduciary duty (Count II) and negligent supervision (Count IV). D. 54. On June 12, 2014, at the final pretrial conference, the Court denied Cavanaugh's motion for spoliation and sanctions, D. 35, granted his motion to dismiss Counts II and IV with prejudice, D. 54, and denied the Government's motion for judgment as a matter of law, D. 46, as to Count III, reserving judgment on Count I. D. 56, 58.

The matter proceeded to a bench trial on the two remaining counts, Counts I and III on June 16, 2014 ("Trial Day 1"). Testimony continued on June 17, 2014 ("Trial Day 2"), June 18, 2014 ("Trial Day 3") and June 19, 2014 ("Trial Day 4"). During the trial, the Court heard the testimony of Cavanaugh and Donahue, and the following witnesses: (1) Sandra Diaz, Ph.D., a clinical psychologist at the Bedford VA Medical Center; (2) Christopher Krebs, Ph.D., another clinical psychologist at the Bedford VA Medical Center; (3) Timothy Dalton, a former patient at the Bedford VA Medical Center who now works at the Brockton VA; and (4) Herbert French, a rehabilitation technician at the Bedford VA Medical Center. After the submission of proposed findings of fact and conclusions of law from counsel, D. 65, 66, the Court heard closing arguments on July 23, 2014 ("Trial Day 5").

## III.   FINDINGS OF FACT

In light of the evidence presented to the Court, the Court makes the following findings of fact:

### A.   VA's Treatment Program

1.      When Cavanaugh moved to Massachusetts in 2008, he sought treatment at the Edith Nourse Rogers VA Medical Center in Bedford, Massachusetts (the "Bedford VA").  Ex. 21 at 2; Ex. 24 at 4.[2]  Cavanaugh was admitted into the Bedford VA's Intensive Day Treatment Program ("IDTP") and Aftercare program in April 2009, after reporting that his cocaine and alcohol use was increasing.  Ex. 24 at 5.  IDTP is a two week in-patient program designed to help veterans detoxify and recover.  Donahue Testimony, Tr. 3:88, 99.[3]  Aftercare is an out-patient program designed to help veterans achieve permanent sobriety.  Donahue Testimony, Tr. 3:8, 28; Dr. Diaz Testimony, Tr. 1:17-19.  Veterans are assigned a counselor and followed by a medical team to ensure that they do not relapse.  Donahue Testimony, Tr. 3:44; Dr. Diaz Testimony, Tr. 1:19-20.

2.      Veterans' recoveries are assisted by rehabilitation technicians, as well as by licensed nurses, a licensed nurse supervisor, licensed social workers, licensed psychologists, and physicians.  Donahue Testimony, Tr. 3:44.  The rehabilitation technician reports directly to a nurse manager.  Ex. 3 at 4.  The work of a rehabilitation technician is supervised by a nurse, social worker, and psychologist.  Id.  Rehabilitation technicians are required to seek assistance

---

[2] The Court relies upon the exhibits admitted at trial and the draft transcripts of the trial. References to the docket are referenced as "D. __."  References to exhibits admitted at trial are as "Ex. __."  The reference to pagination of exhibits is to the pages in the exhibit as filed with the Court, rather than to the pagination of the original documents.

[3] References to the transcript of trial testimony are abbreviated as "Tr. __:__," with the first number representing the day of trial on which the referenced testimony occurred and the second number referencing the specific page (or pages) of the transcript of that day's testimony.

from one of these professionals whenever presented with a medical situation beyond their knowledge. Id.

3.      Dr. Sandra Diaz ("Dr. Diaz") is a clinical psychologist employed at the Bedford VA who works with substance abuse patients. Diaz Testimony, Tr. 1:16-18. Dr. Diaz has been a practicing psychologist for over twenty years. Diaz Testimony, Tr. 1:16. She knows Cavanaugh from observing his work on the Veterans Construction Team, a program under the aegis of the Compensated Work Therapy ("CWT") program, and from conversing with him. Diaz Testimony, Tr. 1:32, 39.

4.      CWT is a program under which recovering veterans may earn wages for work performed on VA projects. Cavanaugh Testimony, Tr. 2:85. Its purpose is to provide veterans with structure, income and a sense of purpose through being engaged in productive work. Id. at 98.

5.      Timothy Dalton ("Dalton") is an employee of the Brockton, Massachusetts VA Medical Center (the "Brockton VA") and a recovering alcoholic who first met Cavanaugh in February 2010 when they were both patients at the Bedford VA. Dalton Testimony, Tr. 1:76. They later resided at the Crescent House, a residential facility for recovering addicts together. Id. at 77. Dalton and Cavanaugh discussed their recovery progress with each other. See e.g., id. at 79-80.

6.      Dr. Christopher Krebs ("Dr. Krebs") is a clinical psychologist at the Bedford VA who treats patients who suffer from substance abuse. Dr. Krebs Testimony, Tr. 2:196-97. Dr. Krebs treated Cavanaugh in 2011. Id. at 205.

**B.      Todd Cavanaugh**

7.      Cavanaugh is a Marine Corps veteran who suffers from alcohol and cocaine

addiction.  Cavanaugh Testimony, Tr. 1:122, 129.

### 1.    *Personal Background*

8.      Cavanaugh moved out of his family's home at the age of seventeen after having a difficult relationship with his mother and stepfather.  Cavanaugh Testimony, Tr. 2:84; Ex. 24 at 3-4.

### 2.    *Education and Professional History*

9.      After graduation from high school, Cavanaugh worked a variety of jobs. Cavanaugh Testimony, Tr. 1:123.  In 1985, Cavanaugh enlisted in the United States Marine Corps. Ex. 21 at 2.  He spent the majority of his service stationed in San Diego, California.  Ex. 24 at 4; Ex. 21 at 5.  He was never engaged in combat, but while in the military Cavanaugh worked primarily as an electrician repairing helicopters.  Id.  He was honorably discharged from the Marine Corps in 1989.  Cavanaugh Testimony, Tr. 1:124; Ex. 37 at 1.

10.     After being honorably discharged from the Marines, Cavanaugh returned to Massachusetts briefly before settling in California where he worked a variety of jobs. Cavanaugh Testimony, Tr. 1:124; Ex. 21 at 5.  Beginning around 1990, Cavanaugh had a succession of jobs, including but not limited to employment with the City of Escondido, California, as a construction worker then as a supervisor for the Department of Public Works and later as a letter carrier for the U.S. Postal Service.  Cavanaugh Testimony, Tr. 1:124, 127; Ex. 21 at 5; Ex. 27 at 5.  He was terminated from the City of Escondido job in 1995, Ex. 55; see also Cavanaugh Testimony, Tr. 1:124-26, and later left the postal service in 2008, because he felt it had become too stressful to handle and that it was affecting his sobriety.  Cavanaugh Testimony, Tr. 1:127.

11.     Cavanaugh moved to Massachusetts in 2008 and worked as a "mental health worker" at McLean Hospital.  Cavanaugh Testimony, Tr. 1:128; Ex. 21 at 5; Ex. 27 at 5.  His employment at the hospital ended in December 2009 following a dispute over his allegation of a workplace injury.  Ex. 21 at 5; Ex. 54; Cavanaugh Testimony, Tr. 2:110-11.

12.     At various times from 2010 until 2012, Cavanaugh was employed by the VA in its CWT program for addicts.  Cavanaugh Testimony, Tr. 2:10-11, 85; Ex. 16 at 1; Ex. 24 at 2.  Cavanaugh's CWT employment was disrupted by a December 2010 cocaine relapse.  Ex. 31 at 1.  Cavanaugh has not had a long term job since leaving the CWT program and remains unemployed.  Cavanaugh Testimony, Tr. 2:108-09.

### 3.     *Medical History*

#### a)     Disability

13.     While serving in the Marine Corps, Cavanaugh suffered several non-combat related injuries to his spine, knee, and foot.  Ex. 37 at 1-2.  As a result of these injuries, Cavanaugh began receiving VA disability benefits, for partial disability, in 1989, the year that he was discharged from the Marines.  Id.  On July 11, 2012, Cavanaugh's rating was increased to one hundred percent disability due to "Major Depressive Disorder Associated with Musculoligamentus Strain of the Cervical Spine."  Id. at 1; Cavanaugh Testimony, Tr. 2:83.

14.     In addition to Cavanaugh's Musculoligamentous Strain of the Cervical Spine, the VA has determined that Cavanaugh has other disabilities related to his service.  Ex. 37 at 1-2.  He is 50% disabled due to "Right Knee Limitation of Extension," Ex. 37 at 1; 20% disabled due to "Status Post Left Plantar Fasciitis Release and Scraping of Heel Spur," Id.; 20% disabled due to "Radiculopathy Associated with Musculoligamentous Strain of the Cervical Spine," Ex. 37 at

2; 10% disabled due to "Degenerative Changes Right Knee," Id.; and 10% disabled due to "Tinnitus Associated with Hearing Loss, Left Ear." Id.

b) Mental Health

15.     Cavanaugh has struggled with depression and anxiety.  Ex. 21 at 2.  In 2001, Cavanaugh was diagnosed with attention deficit hyperactivity disorder.  Ex. 27 at 3.  Cavanaugh was treated for "clinical depression" in California in 2005, id., and has been diagnosed with PSTD attributed to childhood trauma.   Ex. 21 at 4.   At the Bedford VA, Cavanaugh was diagnosed with and treated for depression.  Ex. 24 at 7; Cavanaugh Testimony, Tr. 1:134.

c) History of Addiction

16.      Cavanaugh's use of alcohol began in his early teens and his cocaine use began around the age of nineteen.  Cavanaugh Testimony, Tr. 1:129-30; Ex. 21 at 1.  However, due in part to residual trauma from his turbulent childhood and the failure of his first marriage, Cavanaugh's drug and alcohol abuse escalated in later years.  Cavanaugh Testimony, Tr. 1:130.

17.     Cavanaugh made his first attempt at addiction recovery around the age of twenty-two but did not complete the program.  Cavanaugh Testimony, Tr. 1:135-36.  In subsequent years, Cavanaugh has repeatedly tried, but failed to achieve permanent sobriety from drugs and alcohol despite rehabilitation programs.  Ex. 21 at 1.  Cavanaugh has previously reported that his longest period of sobriety was two years.  Ex. 24 at 7.

18.     Cavanaugh admits that his substance abuse is "terrifying," characterized by loss of friends, family and relationships.  "Using is about destroying [relationships] and everything in your life."  Cavanaugh Testimony, Tr. 1:132-33.

*4.     Personal Relationship History*

19.     Cavanaugh has a long history of difficulty in his relationships with women due, in part, to his addictions, his PTSD and his difficult childhood.  Cavanaugh Testimony, Tr. 2:7-8, 83-84.

20.     Cavanaugh's first marriage was strained, in part, by his drug addiction and they divorced in 1998.  Ex. 21 at 2; Ex. 27 at 4.  He has two children from this marriage, both of whom reside in California.  Cavanaugh Testimony, Tr. 1:121-22.

21.     Cavanaugh married again in October 2007.  Ex. 27 at 5; Cavanaugh Testimony, Tr. 1:123, 128.  He and his second wife separated in 2008 and were divorced in 2010.  Ex. 21.

22.     More recently, Cavanaugh had a turbulent relationship with his now ex-girlfriend, Martha Rumble.  Cavanaugh Testimony, Tr. 2:72.  After an explosive argument with Rumble, the Gloucester District Court issued a "stay away" order against Cavanaugh, and, in June 2010, the charges of assault and battery and harassment were continued without a finding and he was placed on probation until June 2011.  Ex. 24 at 3; Ex. 56.  Although he suffered persistent panic attacks in connection with these charges, he continued a relationship with Rumble through 2010. Ex. 24 at 3.  Cavanaugh considered the relationship to be a "safety net," despite the fighting and allegations of abuse.  Ex. 24 at 3.

23.     In counseling sessions, Cavanaugh joked with Dr. Diaz that he would still call her doctor after they were married.   Dr. Diaz Testimony, Tr. 1:39.  Dr. Diaz felt that this behavior was "normal transference," id., which is common when a client "has positive feelings" towards a therapist.  Id. at 40.  Dr. Diaz explained that when people open up to a therapist, often "it's a new experience for them to have someone completely accept them and not judge them," which can lead to feelings of intimacy.  Id. at 41.  Dr. Diaz explained that, as a clinical psychologist, she has been trained to deal with feelings of transference in her patients and to create the

necessary boundaries without creating shame in the patient. Id. at 41-42. Dr. Diaz confirmed that in her experience it is "fairly common for transference to take place." Id. at 41.

### C. **Renee Donahue**

#### 1. *Personal Background*

24. Donahue is a recovering addict and has worked as a rehabilitation technician at the Bedford VA since 2007, helping other addicts to maintain their sobriety. Donahue Testimony, Tr. 3:2, 12-13. She works with her husband, Don Donahue, who is also a rehabilitation technician, and they have three children and three grandchildren. Id. at 4.

#### 2. *Education and Work History*

25. As a teenager, Donahue dropped out of high school, but she received her GED in 1995. Donahue Testimony, Tr. 3:11-12. Although Donahue has taken a few college level courses, she has no other experience in higher education or trade school. Id. at 11.

26. As noted above, Donahue works as a rehabilitation technician at the Bedford VA. A rehabilitation technician assists recovering addicts maintain their sobriety, through teaching group sessions, individual meetings with veterans, and managing their administrative needs. Donahue Testimony, Tr. 3:14-15; French Testimony, Tr. 4:90-91; Ex. 3.

27. When Donahue was hired, she started as a rehabilitation technician in the IDTP. Donahue Testimony, Tr. 3:8-9, 95. She was later assigned to the Aftercare program. Id.

28. In both IDTP and the Aftercare program, Donahue served as a counselor for veterans struggling with substance abuse. Ex. 3, Ex. 4 at 1. A former addict herself, veterans discuss their recovery goals and methods with her and she helps them with their recovery treatment plans. Donahue Testimony, Tr. 3:98-99. She assists with the activities of daily living; identifying high risk situations, relaxation and confidence techniques, monitoring the

veterans to make sure their recovery stayed on track, and intervene in crises. Id. at 95, 97. The ultimate goal is for the veteran to become self-sufficient. Id. at 98-99; Ex. 3.

29.     As a rehabilitation technician, Donahue meets individually with veterans assigned to her, following up with the veterans if they do not attend meetings and appointments, and assisting veterans in arranging other services and with administrative tasks. Donahue Testimony, Tr. 3:88-89; Ex. 3. Donahue also runs group therapy sessions with veterans. In the Aftercare program, she has run three group sessions each week. Donahue Testimony, Tr. 3:10. Because Cavanaugh was in the Aftercare program, he was required to attend group sessions. Donahue Testimony, Tr. 3:9-10; Cavanaugh Testimony, Tr. 2:3.

30.     Donahue is also required to maintain regular contact with veterans and assist them in finding housing and employment. Ex. 3 at 4. It was "typical" for Donahue to keep in touch with her assigned veterans by telephone. Donahue Testimony, Tr. 3:28.

31.     The position of rehabilitation technician does not require a license or formal training, and Donahue is not licensed as a medical professional or other professional. Donahue Testimony, Tr. 3:10-11; French Testimony, Tr. 4:80; Ex. 3. She is not a highly skilled professional, but her value to the professional team at the Bedford VA is being able to get the veterans to interact appropriately in group therapy sessions. Donahue Testimony, Tr. 3:14-15.

32.     As a rehabilitation technician, Donahue has access to the veterans' medical records, but she does not make medical diagnoses. Donahue Testimony, Tr. 4:2-3; 5-6. She references the medical records only when relevant to her interaction with the veterans. Id.

33.     Donahue received no formal training for the position prior to starting as a rehabilitation technician. Donahue Testimony, Tr. 3:88. Rather, her training consisted of following experienced rehabilitation technicians, watching group sessions, sitting in on

roundtables, and limited computer-based trainings on conflicts, diversity, fire safety, and similar topics.  Id. at 89; Donahue Testimony, Tr. 4:12.  Consequently, Donahue had no training in "transference" or in setting personal boundaries with patients.  Donahue Testimony, Tr. 3:75; Dr. Diaz Testimony; Tr. 1:40-42 (regarding nature of transference).

34.    Donahue is a GS-7 employee and has not earned more than approximately $45,000 in salary.  Donahue Testimony, Tr. 3:4-5; Ex. 3 at 1.

**D.    Cavanaugh and Donahue's Relationship**

*1.    Cavanaugh and Donahue's Relationship Prior to June 2010*

35.    Cavanaugh and Donahue first met in May 2009 when he was in the IDTP. Cavanaugh Testimony, Tr. 2:2; Donahue Testimony, Tr. 4:19.  Donahue was subsequently assigned to be Cavanaugh's rehabilitation technician in the Aftercare program.  Ex. 5 at 2; Cavanaugh Testimony, Tr. 2:2.  Cavanaugh was transferred into the Aftercare program from IDTP after relapsing in the winter of 2009.  Ex. 5 at 1; Cavanaugh Testimony, Tr. 2:9-10.

36.    Cavanaugh was required to meet with Donahue once a week so that she could help him avoid relapses and maintain a healthy life.  Ex. 5 at 2-3; Donahue Testimony, Tr. 3:8.

37.    Upon entering Aftercare, Cavanaugh informed Donahue his long term goals were "to work in the field of addiction/substance abuse, maintain [his] recovery on a daily basis and achieve financial stability."   Ex. 5 at 2; see Dr. Diaz Testimony; Tr. 1:35; Cavanaugh Testimony, Tr. 2:5.

38.    While not officially part of a treatment plan, Cavanaugh also discussed with Donahue his issues with women, such as his inability to commit, his problems maintaining intimate relationships, his regret over his inability to commit to a relationship, and his desire for

a monogamous relationship.  Cavanaugh Testimony, Tr. 2:7-8; Donahue Testimony, Tr. 4:30, 32.

39.     In 2009, while in Aftercare, Cavanaugh relapsed several times.  Ex. 6 at 1 (detailing a relapse at the beginning of August 2009); Ex. 11 at 1 (detailing a relapse in November 2009); Cavanaugh Testimony, Tr. 2:9.

a)      August 2009 Relapse

40.     On August 3, 2009, Cavanaugh telephoned Donahue and informed her that he had relapsed again.  Ex. 6 at 1.  Cavanaugh reported that he was struggling with depression, and that several stressors had contributed to his relapse, including a fight between him and his mother and a "verbally explosive and abusive" fight with girlfriend Martha Rumble.  Id.  He reported to Donahue that his anger and depression from these events caused him to seek out cocaine and get "high all weekend."  Id.

41.     Following his relapse, Cavanaugh telephoned Donahue regularly in August 2009 to inform her of his status.  Ex. 7 at 1-2.  On several occasions, he contacted Donahue to talk about his ongoing relationship problems with Martha Rumble and his difficult relationship with his mother.  Id.  He reported that he was not using drugs, and that attending Aftercare with Donahue was helping him to stay clean.  Id.

b)      November 2009 Relapse

42.     In October and November 2009, Cavanaugh continued to report to Donahue that he was struggling in his relationship with Martha Rumble.  Ex. 9 at 1, Ex. 10 at 2.

43.     On October 2, 2009, Donahue reported making three attempts to call Cavanaugh because he had not made contact or attended Aftercare since September 16, 2009. Ex. 8 at 1.  It was standard practice to make three attempts to reach a veteran who had failed to show up at

treatment events. Donahue Testimony, Tr. 3:16, 32. Under these circumstances, a rehabilitation technician assumes that the veteran has relapsed. Id. When Donahue reestablished contact with Cavanaugh, he reported that he had failed to attend Aftercare because he was struggling with his relationship with Martha Rumble. Id. at 33; Ex. 9 at 1.

44. Cavanaugh called Donahue on November 23, 2009, to check in and report his progress. Ex. 10 at 2. He described feeling better about his life, but was still struggling letting go of his relationship with Rumble. Id. The next day Cavanaugh went to Donahue's office and reported that he was suffering from a spiraling depression. Id. at 1. Cavanaugh explained that he was experiencing nightmares and night sweats and that he had "extreme difficulty" getting up in the morning. Id.

45. On December 3, 2009, Cavanaugh went to Donahue's office for a scheduled meeting. Ex. 11 at 1. He was disheveled and stated that he had relapsed on cocaine both at the beginning and end of November. Id. He had also relapsed on alcohol. Id. Cavanaugh reported that his relapse was the result of "extreme depression" related to the loss of his relationship with Martha Rumble and the legal problems stemming from that relationship. Id. at 1-2. Cavanaugh also cited his continuing "financial stressors" as contributing to his relapse. Id. at 2. Donahue arranged for Cavanaugh to come to the Bedford VA to meet with a counselor and see a doctor. Id.

46. Due to Cavanaugh's repeated relapses, Donahue gave him her husband's work cell phone number. Donahue Testimony, Tr. 3:62; 4:34-35. As noted above, her husband is also a counselor at the Bedford VA. Donahue Testimony, Tr. 3:4. Cavanaugh was instructed to call that number any time he needed assistance outside of normal working hours and Cavanaugh did call Donahue on several occasions. Donahue Testimony, Tr. 4:35.

c)        January 2010 Relapse

47.     On January 4, 2010, Cavanaugh called Donahue and reported that he had again relapsed on cocaine and that he felt as though he was "having a heart attack."  Ex. 12 at 1. Donahue directed him to call 911 so that he could be transported to a hospital.  Id.; Donahue Testimony, Tr. 3:36-37.

d)        Cavanaugh Recommits to His Sobriety

48.     After being admitted to Beverley Hospital following his relapse, Cavanaugh again contacted Donahue about intensifying his treatment at the VA.  Ex. 12 at 1.  Donahue made arrangements for him to be transferred from Beverley Hospital into the IDTP again.  Ex. 15 at 1. Donahue also arranged his admission into the Rogers House, the Bedford VA's temporary home for veterans in need of more structured treatment.  Ex. 14 at 2.  Cavanaugh was admitted into IDTP on January 12, 2010.  Ex. 15 at 1.

49.     At this point, Cavanaugh recommitted to his sobriety.  Cavanaugh Testimony, Tr. 2:49.  Cavanaugh completed IDTP and continued in addiction treatment at the Brockton VA until June 2010.  Cavanaugh Testimony, Tr. 2:182-83; Ex. 16 at 1-2.  He did not have any regular contact with Donahue during this time period.  Donahue Testimony, Tr. 4:35.

2.     *Cavanaugh and Donahue's Relationship After June 2010*

a)        Cavanaugh Returns to the Aftercare Program

50.     On June 14, 2010, Cavanaugh was transferred to the Crescent House, the residential facility for addicts that is run by the Bedford VA.  Ex. 16 at 1-2.  Don Donahue, Renee Donahue's husband, was assigned to be Cavanaugh's counselor at Crescent House.  Id. at 3.  Dr. Diaz was the psychologist at Crescent House.  Id. at 1; Dr. Diaz Testimony, Tr. 1:32.

51.     Thereafter, Cavanaugh was admitted into the Aftercare program for the second time.  Ex. 16 at 1-2.  Donahue was once again assigned to be Cavanaugh's rehabilitation technician.  Id. at 3.  While in Aftercare, Cavanaugh was to receive treatment from both the Crescent House staff and from VA psychiatrist Dr. Corman.  Id.  Other members of his support team included William Gilbert, a rehabilitation technician, Gary Grossi, a Registered Nurse, Rachel Latta, a psychologist, Molly Norton, a Vocational rehabilitation technician, Andrea Valin, a rehabilitation technician and Pamela Joy Wilson, a Licensed Clinical Social Worker.  Ex. 16 at 2; Ex. 17; at 2; Donahue Testimony, Tr. 3:44.  At that time, Donahue ran group therapy sessions in which Cavanaugh participated.  Donahue Testimony, Tr. 3:41.

52.     As of July 2010, Cavanaugh was maintaining his sobriety while living at Crescent House and had passed every urinalysis test, which was a condition of his residence.  Cavanaugh Testimony, Tr. 2:4, 53, 63, 183; see Dalton Testimony, Tr. 1:93.

            b)      Cavanaugh and Donahue's Relationship Develops

53.     It was around this time that Cavanaugh and Donahue's relationship grew closer. Cavanaugh Testimony, Tr. 2:11.  Donahue was concerned about Cavanaugh's wellbeing.  In her experience, addicts are most susceptible to relapse on nights and weekends and so Donahue decided to give Cavanaugh her personal cell phone number to give him an outlet if he thought he was close to relapsing.  Donahue Testimony, Tr. 3:51.   This was not unusual behavior for Donahue, who had given her personal cell phone number to other veterans as well.  Id. at 62-63.

54.     In her previous job, Donahue had always been on call, so she did not think that telephone calls outside of office hours were inappropriate.  Id.  She never fully discussed professional boundaries with Cavanaugh.  Cavanaugh Testimony, Tr. 2:15, 17, 27, 36.

55.     On July 16, 2010, Cavanaugh sent Donahue a handwritten note.  Ex. 19.  The note expressed gratitude to Donahue for her help in finding Cavanaugh treatment for his addiction.  Id.  He described her as being his "teacher, mentor, my anchor at times, councilor friend and now you are family."  Id. at 2.  Cavanaugh's letter was signed, "I love you with all my heart."  Id.  At that time, Cavanaugh also gave Donahue a book and some music, which she kept on her bookcase in her office, but returned to Cavanaugh when he asked for them back.  Donahue Testimony, Tr. 3:46, 50-51.

56.     In retrospect, Donahue admits that a boundary was crossed when she accepted the letter from Cavanaugh.  Donahue Testimony, Tr. 4:37-38.  Donahue, however, continued her friendship with Cavanaugh, id., although she felt uncomfortable about the way that Cavanaugh ended the letter.  Donahue Testimony, Tr. 3:47-48.

57.     On July 20, 2010, Donahue worked on an Aftercare treatment plan with Cavanaugh.  Ex. 17 at 1-2.  Rehabilitation technicians create treatment plans by listening to the veteran and talking to them about their goals.  It is a collaborative effort, overseen by the licensed professionals at the VA.  Id. at 2.  Cavanaugh's plan included attending weekly AA/NA meetings, developing a drug free lifestyle, and keeping in contact with Donahue to update her on his progress.  Id. at 1-2.

58.     Donahue thought that Cavanaugh was nice and that they were friends.  Donahue Testimony, Tr. 3:51.  They often communicated by cell phone and Donahue sent Cavanaugh messages and written meditations relating to maintaining sobriety.  Id.  They also frequently exchanged emails on their VA email accounts.  Id.; Ex. 45-47; 49-53.  Cavanaugh used an official VA email account due to his work in the CWT program.  Cavanaugh Testimony, Tr. 2:34; Ex. 51-53.  Donahue began to think of Cavanaugh as more of a coworker and a friend and

she admits that this blurred their relationship and ultimately interfered with her ability to do her job.  Donahue Testimony, Tr. 3:54.

59.     During these frequent conversations, Cavanaugh talked about his problems and experiences with Donahue, including his relationships with women.  Donahue Testimony, Tr. 4:29-30; see Ex. 19.  He talked about his family, and, in particular about his son, who was in the Marines.  Donahue Testimony, Tr. 3:64.  Donahue likewise told Cavanaugh about experiences and problems in her family life.  Cavanaugh Testimony, Tr. 2:14-15.  For example, Donahue asked Cavanaugh to help her with a weight loss plan, after she learned that another rehabilitation technician had been successful in losing weight with his advice.  Donahue Testimony, Tr. 3:55-56.

60.     After asking Dr. Diaz for permission to do so, Donahue went to Cavanaugh's room at Crescent House at his invitation because he told her that he wanted her to see the decorating that he had done.  Donahue Testimony, Tr. 3:55.  Donahue took her grandson with her on this visit and Donahue's husband was at the facility that day as well.  Id.; Cavanaugh Testimony, Tr. 2:12.   While visiting his room, Donahue told Cavanaugh that a picture of him as a young man was a "really good picture of you."  Donahue Testimony, Tr. 3:55-56.  Cavanaugh was surprised that Donahue would comment on his looks and felt that this comment signaled Donahue's attraction to him.  Cavanaugh Testimony, Tr. 2:12-13.  Cavanaugh cites this incident as the moment when their relationship began to develop romantically.  Id.

61.     Whether romantically or not, Donahue and Cavanaugh's relationship did continue to develop.  Donahue occasionally walked on the VA grounds with Cavanaugh; for example, one time Cavanaugh wanted to show her the VA construction site where his CWT program was working.  Donahue Testimony, Tr. 4:71-72.  They also sat together at the VA picnic tables or at

the gazebo. Cavanaugh Testimony, Tr. 2:14. On other occasions, Cavanaugh would walk Donahue to her car in a VA parking lot. Donahue Testimony, Tr. 3:76-77, 80 & 4:43. During these meetings other people were nearby and Donahue and Cavanaugh remained in plain view. Donahue Testimony, Tr. 3:80. Cavanaugh acknowledges that their interactions while walking the grounds were typical of "people who care about each other" and that they were always "appropriate." Cavanaugh Testimony, Tr. 2:14. However, Cavanaugh did not believe that this behavior was indicative of a counselor and patient relationship. Id.

62.     Donahue also accepted at least one massage from Cavanaugh around this time. Cavanaugh Testimony, Tr. 2:16; Donahue Testimony, Tr. 3:79. Cavanaugh started massaging her neck at an event in a VA parking lot and that she did not stop him. Id. Donahue and her husband were going to see a baseball game and a number of other men from the Crescent House were present in the parking lot. Id. Although Don Donahue was there, Donahue is not sure if her husband noticed the massage. Id. This type of contact was confusing to Donahue. Id. at 77-78. She felt uncomfortable and self-conscious that Cavanaugh was massaging her, especially in front of so many people from the Crescent House. Id. Donahue acknowledges that she encouraged him to continue. Id. Cavanaugh confirms that Donahue was often tense and that when he massaged her he felt that it was partly therapeutic, but Cavanaugh also felt that they were developing a physical intimacy. Cavanaugh Testimony, Tr. 2:16-17.

63.     Donahue and Cavanaugh's frequent cell phone communications increased when Cavanaugh's self-described "foster son," Tyler, died from an overdose, on September 7, 2010. Donahue Testimony, Tr. 3:69-70.

64.     Although the timing is somewhat unclear, Donahue admits that Cavanaugh at some point made a pass at her in her office. Donahue Testimony, Tr. 3:78. Donahue admits

that Cavanaugh kissed her, but says that she did not respond to his advances.  Id.; Donahue

Testimony, Tr. 4:45.  Nor did she report the incident.  Donahue Testimony, Tr. 4:46.

65.     However, it was around this time Donahue started to become concerned about

Cavanaugh's feelings for her and tried to pull back from the friendship.  Donahue Testimony,

Tr. 3:59.  Donahue realized that their relationship had become inappropriate and that their

relationship could be characterized as an emotional affair.  Donahue Testimony, Tr. 4:47.  At

this point, Donahue tried not to speak with Cavanaugh on her cell phone and tried to limit her

contact with him.  Id. at 68.  Donahue still did not discuss these issues with the VA staff or

formally discuss professional boundaries with Cavanaugh.  Cavanaugh Testimony, Tr. 2:36.

66.     Despite Donahue's efforts to limit contact, Cavanaugh continued to pursue the

relationship.  French Testimony, Tr. 4:83-87; Donahue Testimony, Tr. 3:68.  For example,

Cavanaugh regularly brought Donahue an early morning cup of coffee at her office.  Donahue

Testimony, Tr. 3:68.  In response, Donahue began to arrive late to work to avoid Cavanaugh.

Id. at 68-69.  On several occasions, Donahue also had fellow workers accompany her to her car

so that she would not be joined by Cavanaugh.  Id. at 78.

67.     Another rehabilitation technician, Herb French, whose office was next door to

Donahue's and who shared work breaks with Donahue, remembered seeing Cavanaugh walk

past his office in the mornings with coffee for Donahue.  French Testimony, Tr. 4:85. French

also noted that Cavanaugh would regularly show up at the gazebo on the Bedford VA grounds

to talk to Donahue when she took her smoke breaks.  Id. at 82.  French warned Donahue about

Cavanaugh, saying that he felt disturbed by how frequently Cavanaugh came out to see

Donahue at the gazebo on the VA grounds, and that he thought that Cavanaugh was pushing

boundaries with Donahue and "stalking" Donahue.  Id. at 83.  Donahue, however, told French that she could handle the situation.  Id. at 96.

68.     At a certain point, Cavanaugh also felt that the relationship had become unhealthy for him and attempted to distance himself from Donahue.  Cavanaugh Testimony, Tr. 2:39-40. Cavanaugh felt guilty and confused about their relationship and wanted to "move forward."  Id. at 40.  At first, Cavanaugh had regarded their relationship as a supportive friendship, but admitted that at some point he felt that he was falling in love with Donahue.  Id.  Still, Cavanaugh said that he realized that the relationship was not going anywhere.  Id.  at 41. Cavanaugh felt that Donahue had not been looking out for his welfare by allowing their relationship to develop the way that it had.  Id. at 41-42.  Nevertheless, Cavanaugh and Donahue remained in at least sporadic contact.  Id. at 51; see e.g., Donahue Testimony, Tr. 3:69-70.

69.     In late September 2010, Donahue had become so uncomfortable that she concluded that her friendship with Cavanaugh had blurred her ability to do her job of counseling him and that she was no longer effective in her role as his drug rehabilitation counselor.  Donahue Testimony, Tr. 3:59-60.  She asked Cavanaugh to find another rehabilitation technician.  Id. at 60.

70.     Cavanaugh believed that it was around this time – September 2010 – that Don Donahue discovered the full extent of Cavanaugh and Donahue's relationship.  Cavanaugh Testimony, Tr. 2:44.

71.     In late October 2010, one of the veterans living at Crescent House died of a drug overdose.  Ex. 22 at 1-2; Cavanaugh Testimony, Tr. 2:44.  Donahue's husband, Don Donahue, was called to Crescent House and she accompanied him.  Donahue Testimony, Tr. 3:57-58.  A

group of veterans were standing in the parking lot when the Donahues arrived.  Id. at 58; Dalton Testimony, Tr. 1:86-87.  Don Donahue was upset with the loss of the veteran and told the other residents waiting in the parking lot, including Cavanaugh, that if they did not like it at Crescent House, they should leave.  Dalton Testimony, Tr. 1:87.  Cavanaugh believed that this was really directed at him and that Don Donahue was angry with Cavanaugh because of Cavanaugh's relationship with Donahue.  Cavanaugh Testimony, Tr. 2:44.  Cavanaugh reacted in a confrontational and hostile way.  Donahue Testimony, Tr. 3:58.  At that point, Cavanaugh did not feel safe at Crescent House any longer.  Id.; Ex. 22 at 2.

72.     Donahue told Dalton, another veteran living at Crescent House who was standing nearby during the altercation, that she believed that Cavanaugh was attacking her husband because she had pulled away from her relationship with Cavanaugh.  Donahue Testimony, Tr. 3:59.  Donahue also told Dalton that she thought that her husband was angry about Cavanaugh and Donahue's relationship.  Dalton Testimony, Tr. 1:92.  This incident confirmed for Donahue that she no longer wanted to be Cavanaugh's rehabilitation technician.  Donahue Testimony, Tr. 3:60.

73.     Prior to this incident in the parking lot of the Crescent House, Cavanaugh had told Dalton that Donohue and Cavanaugh were having a sexual relationship.  Dalton Testimony, Tr. 1:89.  Dalton found Cavanaugh's revelation of a sexual relationship with Donahue "shocking," but he did not tell anyone about Cavanaugh's revelation because Dalton thought it was "nobody's business."  Id. at 90, 93.  When Donahue told Dalton that her husband was angry about Cavanaugh and Donahue's relationship, Dalton assumed "based on what [Cavanaugh had] said" that Donahue meant that her husband was upset about a sexual relationship.  Id. at 92.  Donahue testified, however, that she only meant to communicate that Donahue had told her

husband about how strained her relationship had become with Cavanaugh and her husband was upset about the situation. Donahue Testimony, Tr. 3:59-60.

74. Soon after this altercation, Donahue realized that she had done something wrong in pretending that Cavanaugh's friendship with her was not a problem and in telling no one at work about the situation. Donahue Testimony, Tr. 3:74-75.

75. Immediately after the incident at the Crescent House, Cavanaugh made plans to move into his own apartment. Ex. 22 at 2. Donahue served as a reference for Cavanaugh to help him get his own apartment. Donahue Testimony, Tr. 3:71-72; Ex. 49. On November 5, 2010, Cavanaugh emailed Donahue thanking her for her help getting with the apartment. Ex. 49. He finished the email saying "I love you and thanks." Id.

76. When Cavanaugh moved out of the Crescent House he was maintaining his sobriety. Cavanaugh Testimony, Tr. 2:63. When Cavanaugh moved, Donahue attempted to terminate her relationship with Cavanaugh and she stopped returning his calls. Donahue Testimony, Tr. 3:73; Ex. 51.

77. In mid-November, Donahue and her husband went out of town for a family reunion. Cavanaugh emailed her on November 16, 2010, expressing his anger that she left town and did not tell him. Ex. 50. He was also upset that she had not called him for several days. Id.

78. Cavanaugh emailed her again on November 18, 2010. Ex. 51. He expressed frustration with the treatment he was receiving at the VA and at Donahue for ignoring him. Id. He alluded to the October incident between him and Don Donahue, and expressed anger at Don Donahue for confronting him. Id.

79. Although Donahue was attempting to distance herself from Cavanaugh, after Cavanaugh moved out of the Crescent House and after Donahue had received the angry emails,

she made another attempt to reach out the Cavanaugh and repair the relationship. Donahue Testimony, Tr. 3:77. In late November, at the end of the work day, Donahue met Cavanaugh in the parking lot and showed him her new car. Id. They spoke briefly, but Donahue was careful to have co-workers nearby. Id.

80.     In December, 2010, after moving out of the Crescent House, but while still in the Aftercare program, Cavanaugh relapsed on cocaine and subsequently left the VA program. Cavanaugh Testimony, Tr. 2:52. After relapsing at the end of 2010, Cavanaugh continued using cocaine throughout 2011 and 2012. Cavanaugh Testimony, Tr. 2.

81.     In January 2011, Cavanaugh reported to Dr. Diaz that he and Donahue had had an affair. Dr Diaz Testimony, Tr. 1:46. When Cavanaugh showed up at Dr. Diaz's office and said that he needed to speak with her, he appeared to be in emotional distress. Id. Dr. Diaz sat down with him and Cavanaugh informed her that he felt "dirty and dishonest" about a sexual affair with Donahue and that he had been ignoring Donahue's calls. Id. at 49. Cavanaugh, however, did not tell Dr. Diaz that the affair had affected his recovery or that he had relapsed. Id. at 49. Dr. Diaz was concerned about getting him the emotional support he needed regardless and she suggested that he speak with someone. Id. at 50-51.

82.     Following a report from Dr. Diaz after Cavanaugh's January 2011 visit, Cavanaugh was transferred to Dr. Krebs. Cavanaugh Testimony, Tr. 2:59-60. Cavanaugh was depressed and anxious in his sessions with Dr. Krebs and Cavanaugh attributed his relapse and emotional state to his affair with Donahue. Dr. Krebs Testimony, Tr. 2:208. Cavanaugh, however, did not discuss the details of the affair with Dr. Krebs and told Dr. Krebs that he was "ambivalent" about the relationship. Id. at 209. Cavanaugh also discussed the death of his "foster son," Tyler, his relationship with Martha Rumble and his recent bankruptcy. Id. at 211.

Dr. Krebs recalls that Cavanaugh was extremely upset about the bankruptcy and that he described his relationship with Rumble as "unhealthy." Id. at 211-12.

83.     In mid- 2013, Cavanaugh telephoned Dr. Krebs and told him that he was using cocaine.  Dr. Krebs Testimony, Tr. 2:218.  Dr. Krebs told Cavanaugh that he would see Cavanaugh when he was sober but not before.  Id.  Dr. Krebs has not heard from Cavanaugh since that telephone call.  Id.

84.     Cavanaugh sought in-patient rehabilitation treatment at the White River Junction VA in spring 2014.  Cavanaugh Testimony, Tr. 1:139-40; Ex. 62.  He left two weeks later in an "irregular discharge" before the end of his treatment program, without speaking to his caregivers.  Id.  When his therapist was able to reach him by phone Cavanaugh reported he was doing well and attending AA meetings, but that he felt that he had to leave the program due to the "toxicity" of some of the other residents and Cavanaugh believed that he had gotten everything out of the program that he could.  Ex. 62.

85.     Cavanaugh now lives with his current girlfriend and is working towards recovery but admits that he has been relapsing.   Cavanaugh Testimony, Tr. 2:176; Ex. 62.

## IV.     CONCLUSIONS OF LAW

In light of the evidence presented to the Court, the Court makes the following conclusions of law:

**A.    Cavanaugh has not Proved His Malpractice Claim**

86.    Cavanaugh alleges that Donahue breached her professional duty of care when she allegedly used her position as a rehabilitation technician at the Bedford VA to initiate a sexual relationship with him.   D. 1.

87.    Under Massachusetts law, to succeed on his professional malpractice claim, Cavanaugh has the burden of proving by a preponderance of the evidence: (1) that Donahue owed Cavanaugh a duty of care; (2) the applicable standard of care; (3) that Donahue breached her duty of care; and (4) the breach was the proximate cause of Cavanaugh's injury.  Poyser v. United States, 602 F. Supp. 436, 438 (D. Mass. 1984); McMurdo v. Getter, 298 Mass. 363, 367 (1937); Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 113 (1st Cir. 2010).

*1.    Donahue did not Owe Cavanaugh a Professional Duty of Care*

88.    To show that Donahue owed Cavanaugh a duty of care, Cavanaugh must first prove that a rehabilitation technician is a "professional" under Massachusetts law.  McMurdo, 298 Mass. at 367-68; Strategic Energy LLC v. Western Mass. Electric Co., 529 F. Supp. 2d 226, 237 (2008) (rejecting expansion of the tort of professional negligence to electrical distributors where no cases cited recognizing any special duty owed by such actors).

89.    "Professions" are generally "conceived in terms of the learned professions."  51 Mass. Prac., Professional Malpractice § 18.4 (internal quotations omitted).  "Traditionally, the learned professions were theology, law and medicine; but some other occupations have climbed, and still others may climb, to the professional plane."  McMurdo, 298 Mass. at 367.

90.    The Supreme Judicial Court has found that the term professional "means something more than mere proficiency in the performance of a task and implies intellectual skill" and that a "professional service" is a service that "aris[es] out of a vocation, calling, occupation,

or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual . . . . " Roe v. Federal Insurance Co., 412 Mass. 43, 48 (1992).

91.     On the present record, a rehabilitation technician is an unlicensed position that requires no advanced degrees or training.  As noted above, Donahue's highest completed level of education is high school.  Donahue Testimony, Tr. 3:11.  Donahue's only required training for her position of rehabilitation technician consisted of following experienced rehabilitation technicians, watching group sessions, sitting in on roundtables, and limited computer-based trainings on conflicts, diversity, fire safety, and the like.  Donahue Testimony, Tr. 3:88-89; 4:12-13.  Donahue is also not licensed as a medical professional or other professional and is classified as a GS-7 employee.  Donahue Testimony, Tr. 3:4; French Testimony, Tr. 4:80; Ex. 3 at 1.   She reports to professional level, highly skilled employees, but she is not highly skilled.  Donahue Testimony, Tr. 3:10-11.  Although Donahue does have access to the veteran's medical files, she does not make diagnoses and has no training in interpreting medical records.   Donahue Testimony, Tr. 4:2-3; 5-6.  As a former addict herself, Donahue's primary skill is being able to relate to and support the veterans.  Donahue Testimony, Tr. 3:98-99.

92.     Accordingly, the Court concludes that the responsibilities of rehabilitation technicians fall outside the definition of "professional" as defined by Massachusetts law, McMurdo, 298 Mass. at 367, and, therefore, Cavanaugh has not shown that Donahue owed Cavanaugh a professional duty of care under Massachusetts law.

                    *2.     Cavanaugh has not Proved the Applicable Standard of Care*

93.     Even assuming that Cavanaugh had proved that Donahue was a professional and owed Cavanaugh a duty of care, Cavanaugh has not proved the applicable standard of care.  "The

proper standard is whether the . . . practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession." <u>Palandjian v. Foster</u>, 446 Mass. 100, 104 (2006).

94.  The testimony proffered by Cavanaugh as to the professional standard of care was the testimony of Dr. Diaz and Dr. Krebs. This testimony, however, was restricted to the standard of care for licensed psychologists and did not concern the standard of care for rehabilitation technicians like Donahue. Dr. Diaz Testimony, Tr. 1:27-30; Dr. Krebs Testimony, Tr. 2:218-19. Dr. Diaz and Dr. Krebs provided no evidence that a rehabilitation technician was a professional or any knowledge regarding any standard of care applicable to such an occupation. <u>Id.</u>

95.  For example, Dr. Diaz testified that she did not know if rehabilitation technicians have a code of ethics or how they define their duties. Dr. Diaz Testimony, Tr. 1:30. Dr. Diaz repeatedly testified that she had no knowledge of "other professions" codes of ethics. <u>Id.</u> at 29. Dr. Krebs also declined to comment on the standard of care applied to other professions, stating that he was not familiar with the IDTP or Aftercare programs, he was not aware if rehabilitation technicians had access to patient medical records and that he could not speak to other professional standards of care. Dr. Krebs Testimony, Tr. 2:197-98, 218-19.

96.  Accordingly, the Court finds that Cavanaugh has not proved the applicable standard of care applied to rehabilitation technicians.

### 3.  *Cavanaugh has not Proved Breach*

97.  Donahue admits that she overstepped boundaries with Cavanaugh because the line between counselor and addict became blurred as their relationship developed. <u>Id.</u> Donahue further admits that her relationship with Cavanaugh developed into, at least, an emotional affair. <u>Id.</u>

98.     The Court acknowledges that a lot of what occurred between Donohue and Cavanaugh is troubling.   Nevertheless, the Court does not conclude, on this record, by a preponderance of the evidence that a sexual affair occurred (even as Cavanaugh testified about having oral sex with Donahue on several occasions in a car and intercourse on one occasion in a secluded area, Cavanaugh Testimony, Tr. 2:18-22).   Donahue did admit to breaching certain professional boundaries, but continues to deny a sexual affair with Cavanaugh.   Donahue Testimony, Tr. 3 & 4.   Moreover, although Dalton testified that Cavanaugh had told him in the "early fall" of 2010 that Cavanaugh and Donahue were having a sexual relationship, Dalton Testimony, Tr. 1:89, the only corroboration of the sexual relationship is Cavanaugh's own self reports.   Cavanaugh and Donahue spent time together on the grounds of the Bedford VA, however, during these meetings other people were always nearby, including Donahue's husband, who worked at the facility, and Donahue and Cavanaugh remained in plain view.   Donahue Testimony, Tr. 3:80.   Despite appearing in public regularly, no one at the Bedford VA reported witnessing Cavanaugh and Donahue interacting in a way that suggested their relationship had moved beyond a friendship.

99.     However, even assuming that Donahue and Cavanaugh's friendship grew into a sexual relationship, it is not clear that a consensual sexual relationship would violate a professional standard of care under these circumstances.

100.     First, Cavanaugh himself considered the relationship consensual.   See Cavanaugh Testimony, Tr. 2:12-13.   Even when reporting the affair to Dr. Diaz and Dr. Krebs, Cavanaugh did not suggest that the affair was coerced.   Dr. Diaz Testimony, Tr. 1:46-50; Dr. Krebs Testimony, Tr. 2:209.   In fact, Cavanaugh seem to have actively pursued the relationship with Donahue.   Cavanaugh brought Donahue coffee in the morning, would join her in the gazebo on

her smoke breaks and would stay after group sessions to talk with her or to walk her to her car. Cavanaugh Testimony, Tr. 2:14; Donahue Testimony, Tr. 3:68. Cavanaugh initiated at least one massage with Donahue and Cavanaugh admits that, on some level, he intended to develop a physical intimacy with Donahue. Cavanaugh Testimony, Tr. 2:16-17. Furthermore, Cavanaugh testified that he thought that he was falling in love with Donahue. Cavanaugh Testimony, Tr. 2:40. Finally, when Cavanaugh reported to Dr. Krebs that he had had an affair with Donahue, the concern he expressed to Dr. Krebs about Donahue was how the relationship ended and not about any other aspects of the relationship. Dr. Krebs Testimony, Tr. 2:216-17.

101. Second, Donahue was not Cavanaugh's primary source of care in the VA's treatment program. Indeed, while in the Aftercare program, Cavanaugh received treatment from a large team, which included a number of licensed medical professionals. Ex. 16 at 1-2; Donahue Testimony, Tr. 3:44. As noted above, members of Cavanaugh's support team at the time the affair allegedly occurred included VA psychiatrist Dr. Corman, William Gilbert, a rehabilitation technician, Gary Grossi, a Registered Nurse, Rachel Latta, a Psychologist, Molly Norton, a Vocational rehabilitation technician, Andrea Valin, a rehabilitation technician and Pamela Joy Wilson, a Licensed Clinical Social Worker. Ex. 16 at 2; Ex. 17; at 2; Donahue Testimony, Tr. 3:44. Donahue's role was simply to relate to the veterans as a former addict who could understand and support them in their journey to sobriety. Id.; Ex. 3; French Testimony, Tr. 4:90-91.

102. Under these circumstances, the Court is not prepared to find that a breach of any duty by Donahue, even if any duty of car had been established. Accordingly, the Court finds that Cavanaugh has not proved breach.

### 4.    *Cavanaugh has not Proved Causation*

103.   Finally, even if Cavanaugh had shown that Donahue breach her duty of care, the Court cannot find by a preponderance of the evidence that the breach was the proximate cause of Cavanaugh's injury.

104.   Failing to show causation is particularly evident here, where, as the record above reflects, a combination of traumatic life events contributed to Cavanaugh's relapse in December 2010.   Cavanaugh Testimony, Tr. 2:67; Ex. 23; Ex. 24 at 2-3, 8-9.   During the relevant time period in this case, between July and December 2010, Cavanaugh was going through a divorce from his second wife, had declared bankruptcy, broke up with his girlfriend, Martha Rumble, was dealing with the suicide of a fellow veteran at Crescent House in October 2010 and was dealing with the overdose death of the young man whom he considered his foster son in September 2010.   Id.   Cavanaugh reported that these transitions and losses made him feel "irritable, 'up and down,' jumpy, and fidgety lately, as wells as 'worn out'/emotionally drained." Ex. 27 at 2-3.

105.   The Court notes that Cavanaugh did not attribute his mental condition, in whole or in part, to his relationship with Donahue until after he had left the VA rehab program in January 2011.   Dr. Krebs Testimony, Tr. 2:205; Dr. Diaz Testimony, Tr. 1:46.   When Cavanaugh did report a sexual relationship to Dr. Diaz and Dr. Krebs in January 2011, Dr. Krebs testified that Cavanaugh seemed "ambivalent" about the relationship with Donahue and upset primarily about the way the relationship ended.   Dr. Krebs Testimony, Tr. 2:209.   However, Cavanaugh also discussed the death of his "foster son," Tyler, his relationship with Martha Rumble and his recent bankruptcy.   Id.   Dr. Krebs recalls that Cavanaugh was extremely upset about the bankruptcy and that he described his relationship with Rumble as "unhealthy."   Id.

106. In light of the totality of circumstances, the Court cannot conclude that the alleged breach of any alleged duty of care was the proximate cause of Cavanaugh's injury. Accordingly, the Court finds that Cavanaugh has not proved his professional malpractice claim.

**B.** **Cavanaugh has not Proved His Intentional Infliction of Emotional Distress Claim**

107. To satisfy his burden, Cavanaugh must prove by a preponderance of the evidence that Donahue: (1) intended to cause, or should have known that her conduct would cause, emotional distress; (2) that Donahue's conduct was extreme and outrageous; (3) that Donahue's conduct caused Cavanaugh's distress; and (4) that Cavanaugh suffered severe distress. <u>Sena v. Commonwealth</u>, 417 Mass. 250, 263 (1994), <u>citing</u> <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144-45 (1976), and <u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99 (1987).

108. Cavanaugh must prove that the conduct complained of was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized community. <u>Foley</u>, 400 Mass. at 99. The Court notes that this is a very high standard. Here, "liability cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." <u>Foley</u>, 400 Mass. at 99 (<u>quoting</u> Restatement (Second) of Torts § 46, comment d (1965)) (internal quotation marks omitted).

*1.* *Cavanaugh has not Proved that Donahue Should Have Known her Conduct Would Cause Emotional Distress*

109.   It is not clear from the record that Donahue should have known, let alone intended, that her relationship with Cavanaugh would have caused him distress.  As discussed in some detail above, Donahue is not a medical professional and had not received robust training on appropriate professional boundaries or the perils of transference.  Donahue Testimony, Tr. 3:75.

110.   Although Donahue testified that she had some concept of the term "professional boundaries," Donahue admits that when she began working with Cavanaugh that she did not think much about her behavior or the kind of relationships that could affect the veteran's treatments.   Donahue Testimony, Tr. 4:12-14.   Donahue communicated regularly with Cavanaugh through VA-issued work email accounts and Cavanaugh had told Donahue that he had worked in mental health care.  Donahue Testimony, Tr. 4:26, 53.  As a result, Donahue admits that she quickly began to think of Cavanaugh as her friend and peer.  Id. at 6, 51.

111.   Although Donahue did discuss personal relationships with Cavanaugh and was aware of some of Cavanaugh's issues with women, including his tumultuous relationship with Martha Rumble, Donahue was unprepared for how Cavanaugh might respond to her support of him as his rehabilitation technician.   Donahue Testimony, Tr. 3:6-7; 4:29-31.   Without appropriate training in transference, Donahue did not understand the risks inherent in her candid relationship with Cavanaugh.   Id.   As Dr. Diaz explained, when people reveal personal information in a therapeutic setting and they receive acceptance, perhaps for the first time, it is very common for feelings of intimacy to develop.  Dr. Diaz Testimony, Tr. 1:41.  Without training in how to deal with these feelings of transference, Donahue did not fully understand the risks associated with her behavior.

112.   Cavanaugh has not shown that Donahue intended to cause Cavanaugh distress nor has Cavanaugh proved that Donahue had the level of training or knowledge necessary to show

that she knew or should have known that her behavior would cause him distress. Accordingly, the Court finds that Cavanaugh has failed to prove that Donahue intended to cause, or knew she would cause, emotional distress.

*2.*      *Cavanaugh has not Proved that Donahue's Conduct was Extreme or Outrageous*

113.     Cavanaugh has not proven by a preponderance of the evidence that Donahue's actions were extreme or outrageous. Even if the Court assumes that Donahue had a sexual relationship with Cavanaugh, as noted above, there is no evidence that Donahue coerced or intimidated Cavanaugh. Nor is there any evidence that Donahue was in a position to enforce her will upon Cavanaugh. There is no evidence that Donahue had control over his residence at the Crescent House, his work assignments, his income, his lifestyle, or any factors that could be utilized for coercion and control. Cavanaugh attended her group sessions with a number of other addicted veterans, but a number of other VA personnel were assigned to provide him care.

114.     Cavanaugh pursued the relationship with Donahue, bringing her coffees, meeting her at her office and calling and emailing her frequently. Donahue was not a medical professional and was not appropriately instructed on setting professional boundaries. She was hired largely due to her status as a former addict who could relate to the veterans and help them through moments of crisis. Under these circumstances, the Court cannot conclude that the relationship between the two was beyond all possible bounds of decency. Foley, 400 Mass. at 99. Accordingly, the Court concludes that the evidence was presented was insufficient to warrant a finding that Donahue's conduct toward Cavanaugh rose to the level of "extreme and outrageous conduct" required for the tort of intentional infliction of emotional distress. See id.

*3.*      *Cavanaugh has not Proved that Donahue Caused Cavanaugh's Distress*

115.  As noted above, the record demonstrates that during the relevant time period Cavanaugh suffered a combination of traumatic life events, which contributed to Cavanaugh's relapse.  Cavanaugh Testimony, Tr. 2:67; Ex. 23; Ex. 24 at 2-3, 8-9.  The Court cannot conclude, therefore, that Cavanaugh's purported sexual relationship with Donahue was the cause of his emotional distress and relapse.

116.  Accordingly, the Court finds that Cavanaugh has not proved his intentional infliction of emotional distress claim.

## V.     CONCLUSION

After consideration of the evidence presented at trial and in light of the aforementioned findings of fact and conclusions of law, this Court finds that judgment will enter in favor of the Defendant.  In light of this ruling, the Court DENIES the Defendant's motion for judgment as a matter of law as to Count I, which was reserved upon at the start of trial, D. 46, as moot.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge